Our third case for this morning is Miller v. Polaris Laboratories. Mr. Darst. Thank you, Your Honor. May it please the Court. Chontel Miller was the only African American in the Polaris Sample Processing Department. She was not trained equally to the white employees by the supervisor, Rhonda Powell. She complained about that to Powell's supervisor, who was manager, Deborah New. Deborah New did not require the supervisor to give equal training, but rather placed the African American in a separate training room by herself for about a week and showed her training modules while Deborah New was in and out of the room. Didn't Young or one of the new Caucasian people join her in that room? That is correct. Amanda Saperstein was placed in there about a week later when she was hired. And at that time, Chontel Miller asked Amanda Saperstein if there was some reason that the other employees did not like her. Amanda Saperstein said, well, Rhonda Ballard called you the colored girl. So here's the essence of the, I think, issue in this case. The reason that the people who did fire her gave was that after eight months, she just was not anywhere close to their expectation. She had one day in eight months where she exceeded the 260 trays per day requirement. And most of the time, she was so far below that that even if you factored in some level of disadvantage from tampering or from bad training, you still can't fill that gap. And so it's hard to see why when all is said and done, one could find that she was, that her adverse employment action was taken for an impermissible reason. Yes, Polaris' argument there just ignores all the evidence because, for example, as soon as Miller complained about the race discrimination being called the colored girl, not getting equal training, not getting help from the white employees like the white employees helped each other, but rather just sticking their head in and seeing if she was done yet so they could go home, she complained about that. And instead of correcting that situation and providing her equal treatment, Polaris, Rhonda Miller, excuse me, Rhonda Ballard in particular, became very angry at Chantel Miller. No, Ballard seems to be an awful person, but the thing is, first of all, we have to see who were the decision makers. And I understand your argument to be that the people like Ballard who were more on the floor made it impossible for her to come close to this 260 per day, but her daily average was 184. And it was way lower. Correct. And the reason, the way that Rhonda Ballard retaliated immediately after Chantel Miller complained were several ways. Number one, Rhonda Ballard then refused to even talk to Chantel Miller. Deborah New, who was the decision maker, did not correct that, but rather said, you come to me, Chantel, if you have questions about how to do the accounts. Why was that a discriminatory thing to do if Ballard was so unhelpful? Because the way to change unequal treatment is to have that treatment become equal, not to separate or segregate the African American, not to give her less unequal training, which that was because, as Chantel Miller described, she observed Rhonda Ballard, who was the supervisor of this unit, stand over the sample processors and show them how to do it, and then correct them, give them hints on how to handle the accounts, which was very important because after the formal training in the classroom, which Chantel Miller passed and had no problem with, and she also had data entry experience before, so she was an experienced data processor. So instead of having that training from Rhonda Ballard in the department, she had to leave the department, go try to find the manager, who was often not even in her office, but was around the plant somewhere else or even out of the plant in other locations around the country. So if I can try the question maybe a different way. So there's this big gap between what her performance was, except on maybe a day or two, and the quota. Right. Is there any viable argument that this unequal training, et cetera, can account for that entire gap? Oh, absolutely. What is the argument? All right. How do you get from down here to up there? Okay, there were several methods in addition to the unequal training that Ballard used to retaliate against Miller. For instance, another method was to assign Miller the harder accounts. That was seen not only by Chantel Miller, but also by Bobby Jo Young, who reported that to Debra New, and Debra New is still doing that. So in your reply, you cited some statistics, I think, on that. Yes. So how much of the gap does that account for? In other words, I guess what I'm saying is if this case had gone to trial, you know you were going to get the argument that the quota is whatever it is, and she's way down here. Even if you account for this lack of training, it's not enough to get her up to snuff. How were you going to try to defeat that argument at trial? First of all, there's no evidence that the lack of training, the harder accounts, the refusal to talk to her, treating her as an outcast, and making her work hell every day, there's no evidence that that had no effect on her performance. Of course it would have an effect on her performance. Now here is an experienced data entry person who is African American. She's done this before. She passed all of the classroom training, and yet when she is given accounts, she's not told how to handle the accounts. This is very important because each account is handled differently. As a matter of fact, there are harder accounts and harder trays than other accounts and other trays. The evidence was that Ballard, in her anger, even said to the Whites, here, I'm giving you an easy tray now, and she never said that to Chantel Miller. There's no evidence that this had no effect on her performance. Of course it had an effect on her performance. As a matter of fact, she is an experienced data processor who knew her performance capability, and she testified that that was the reason that she was not able to obtain the quota until the very end where she was trying to come up to the top and finally got to the 260 per day. Well, one day she exceeded 260. Well, that's what the records showed, sure. One day she finally got to the 260, and then they immediately terminated her, didn't even let her finish the probation. Well, because the rest of April, again, she wasn't very close to it, right? That was also due to the lack of training, the harder accounts, the failure to talk to her. I mean, if you were not talked to, you came into work every day and nobody talked to you, nobody trained you, nobody showed you how to do the accounts, you had to do that. I don't understand. It would be terrible. So there is no evidence that that had no effect on her, and that's just an unreasonable inference, and inferences can't even be argued on a motion for summary judgment. Also, there's plenty of additional evidence. Young reported this in addition to Miller, and no one did anything about it. As a matter of fact, when Miller complained about the discrimination, they did not investigate in March, didn't investigate in April, and wouldn't even show her the reports. But here's a person who's struggling under all of these burdens, and then finally gets up to the $2.60 per day, and they immediately terminate her. And don't show her the reports, don't talk to her about how, hey, it looks like you're coming up, let's go ahead and have this review on May 3rd, let's see what we can do. And all of the documents relate back to Rhonda Ballard, for instance. Chantal Miller was terminated based on the probation notice, the retaliatory second probation notice, which was retaliatory in itself. And that then referred back to Rhonda Ballard's review of her, and the quote is set for her by Rhonda Ballard. And in that review, it states that she was given a lot of paperwork strays, which means that you can't just enter consecutive instructions on a tray, you have to follow new instructions for each piece of paperwork. Not only harder accounts, but it was given paperwork strays, and so it was observed by Miller and by Bobby Jo Young. Isn't it true that the assignments were given out randomly? No. As a matter of fact, well, I think, no. First of all, the accounts were not given out randomly. The accounts were signed by Ballard. Secondly, the evidence shows that after the accounts were done by the assigned sample processors, then they could go to the table and pick trays. I thought Schatz gave the first tray out. Is that wrong? Pardon me? Schatz? I thought the first tray was given out by Terry Schatz. Terry Schatz did some organizing at the beginning of the morning, but she did not assign accounts. It was the accounts that were the harder accounts, and then after the morning when Schatz organized the trays, then Ballard would go through and not only sabotage Miller's trays, which is another means that she used to make life hell for Miller every day, but she also assigned then different trays, and she would say, as I said before, Ms. So-and-so, who's a white lady, here's an easy tray for you, and she never said that for Miller and rubbed it in the face of Miller. Now, on the sabotage, which is very important, because you don't often have in a discrimination case evidence of sabotage against the African American or against a minority employee, but here she was caught, Ballard and Kemp were caught on a few occasions by Miller, also caught by Young, and Young told New, so New knew this and didn't take any action at all and didn't investigate it and just stood up for Ballard and protected the discriminator, Ballard. Now, the point is that sabotage is done in the dark, or done without witnesses. And so the fact that someone was caught a few times does not mean that that was the only time they sabotaged her trays, and Ms. Miller testified that Ms. Ballard made her work hell every day. She complained almost every day to New, and New did not do anything and did not investigate, did not take corrective action, so New was personally involved. And then when Miller complained a second time to the HR representative, Ziegler, in March, instead of investigating and taking action for Miller, Ziegler and New and Ballard gave Miller the second retroactive second probation after she just finished her probationary period. And then it was, since it was retroactive, there was probably no way that anybody could have completed it because they didn't even tell her for seven days. So that was retaliatory, and then they didn't investigate. And then when she complained that, hey, this termination is based on the previous discrimination retaliation, they didn't investigate that. Nobody investigated it. Nobody took any corrective action for her. Thank you very much. Okay, thank you. Ms. Michelson. Good morning. I'm Jan Michelson, and I represent the Appley Polaris Laboratories. Now plaintiff's counsel raised several issues in his opening argument. He made a lot of allegations, and he voiced many of Miller's perceptions, opinions, speculation, but very little evidence. He referred to it as evidence, but in just those few minutes, and you all have the record, many of those things are simply not true. Rhonda Ballard did not assign the accounts. Debbie New assigned the accounts. Terry Schatz was a full-time opener. She spent her entire job opening the package and traying up the samples. Rhonda Ballard did not assign the quota. It was a uniform quota that all sample processors were assigned after their first month or so of employment, after they had completed training. She and Amanda Saperstein were both in the same room the very first day together. There wasn't a week in between. They were very short-staffed, and Rhonda Ballard and Gina Kemp were the fastest processors. They were super fast. And so Debbie New told everyone, don't interrupt them. We need their production. Do not ask them questions and interrupt their flow. So what about the statistics that Mr. Darst cites in his reply about the percentage of the more difficult types of accounts that the plaintiff supposedly got? Simply not true. You're just making up the numbers. Well, the way that he did it, he said because she processed less, even though she had fewer ad changes, which is kind of a difficult step, then that means that she had a greater percentage of ad changes, which just doesn't make sense, I'm sorry, from a statistical standpoint. Ms. Miller herself testified repeatedly that there are some easy paperwork samples and some hard paperwork samples. There are some difficult and some not difficult. Some paperwork has less work than other paperwork. All of the sample processors complained that they got the hardest samples. But don't we have to take, I mean, that at least I think we have to take in the light most favorable to Ms. Miller. I mean, as I understand the essence of her theory, which is what I'm hoping you'll have something to say about too, is that this case should not be looked at the last minute when Culp knew and Minges decided they're not going to fire her because the data that they're getting has been distorted by all of these different forms of discrimination. It's not that the numbers are wrong per se, but the numbers were. But she was put in an environment in which her numbers couldn't be better than that. And if that's the case, and if we, I suppose, know from at least the one day that she was capable of meeting the 260, why isn't there a problem? Well, because there is no evidence of the more difficult clients, more difficult samples. There is a perception by Ms. Miller of that, but there is no evidence. What about the Young testimony, for example? Young said Ballard told her she was tampering with Miller's samples. Ballard said, don't take it, it's for Chantel. And Young says, yes, don't you see what I'm trying to do here? Young never said that Ballard told her she was tampering with Miller's samples. Young went to get a tray, and we'll take this as true, and Ballard said, that's for Chantel, don't you see what I'm doing here? And then she says, I interpreted that as I'm purposely giving her something to talk about. Yes, she interpreted that as that. There are actually a lot of reasons that people move samples around in trays. One is because there are rush projects, that they pay more to have those done, and they have to be moved to the front of the tray. I have no idea in that particular situation. But isn't one reasonable, I mean, certainly you could infer a lot of things from that. Isn't one reasonable inference from that, given the other testimony about Ballard's racial, apparent racial animus, or at least comments about apparent racial animus, that when she says what I'm trying to do here, what I'm trying to do here is make it harder for her? Isn't that a reasonable inference? I would take that reasonable inference for that one tray. And I would also, I mean, I think it's important because you've now raised Ballard's racial animus. It never, although Mr. Dar said, never was said, never corroborated, that Rhonda Ballard ever called Chantel Miller the colored girl. She never corroborated. Somebody testified about that. No. Nobody testified. Nobody testified. The one person that heard it was Amanda Saperstein. She testified that she doesn't know who said it. Now, Ms. Miller decided that Rhonda Ballard said it. The other thing that I think is important, and you mentioned, and, you know, we have to look at what happened. Wasn't there testimony from Ms. Young about this conversation where Ms. Kemp used the N word in referring to Ms. Miller in Ms. Ballard's presence and Ms. Ballard laughed and said, I'm in the same boat with you? Ms. Young did make that. That's evidence of animus, isn't it? I mean, if somebody makes a racial slur and I laugh and I say I'm in the same boat, that's pretty good evidence of animus. Yes. It's more than you get in most. Ms. Miller, of course, never heard that because that information didn't come out until. So what if she didn't hear it? I understand. It's not about what she heard. It's about what the person's animus is. Yes. Okay. So now let's go back. So if you have a person who makes this comment, well, don't take this sample, this is what I'm trying to do here, and there's some evidence, maybe it's not the Saperstein conversation, maybe it's the other one, that this person has this racial animus, isn't it one reasonable inference from that that when she says what I'm trying to do here, what she means is that I'm trying to make it harder for Ms. Miller? On that particular day with that particular trait, yes, I would agree. So you'd have to prove it for like 10,000? You'd have to have a comment for 10,000 traits? Well, there is no other evidence. Ms. Miller herself, for example, when she had her performance evaluation where she was told that after four months she was only doing 123 samples a day, and again, this is an average. So she got 260 on one day and she got 160 the next day. She has to then get 360. She said she didn't understand the average. This is a monthly average? It's a daily average, but they calculated each month. It's not a daily average. I mean, it's how many you did that day, but then across a month, do you get a daily average? Yes, you get a daily average. So the denominator is the number of work days in the month? Yes, the number of work days, exactly. And so, for example, the argument about, well, she went on probation four days after April started, you know, it doesn't matter. However many days you work, you divide it by that number of days. In fact, she went on vacation the week after she was put on probation. So I guess they get that. I mean, in other words, part of your point is that she was so far below that she couldn't have gotten it up to the average. I guess what I'm wondering about that probation thing is, what are we to make of the fact that they put her on probation retroactively and then they terminate her before the probation is done? Are you saying that's not true either? Well, no. I don't know the term retroactively. What happened is she failed. She was given the first thing after a performance evaluation. You need to improve to 260 by March. By the end of March. And she was at 189. The first four days in April, she started going down. She actually decreased less. So they said, this is not looking good. They told her on the 4th of March, 4th of April, excuse me, that she would have the rest of the month to get up to 260. They did not count her days. She was given full credit for what she processed in the first four days. And, in fact, I think we did a calculation at a brief. Okay, let's give her the maximum for those first four days. We'll just give them to her, and we'll do that into the calculation. She still falls far short. She complained voraciously that she didn't get to do the last day, and I think it was because someone was going out of town. She would have had to process 1,500 samples in one day to make that thing. That wasn't going to happen. She had never done that. But I guess what she was trying to say is, you tell me on April 4th or whatever the day was, a few days into April, that actually now I'm on probation for April 2, and what I'm inferring from that is, had I known that I was under this spotlight, I would have been moving heaven and earth to get those numbers closer to or in excess of the 260. And why didn't she move heaven and earth for the rest of the month? Why didn't she go on vacation? Why didn't she move heaven and earth for the last two weeks of the month? Well, she just wasn't told early enough. And you've said that you just told me that you didn't average in those four vacations. Well, I'm saying we did a calculation. We're saying let's give her the total amount. But when she says she wasn't told early enough, she was told in February. They could have terminated her after March when she didn't make it. They gave her yet another chance. She had already been there six months. Everyone else was doing 309, 363, because once they meet their minimum quota, which 260 was the minimum quota, then they get their quota increased. And so they were all far and above her. Ms. Miller herself. So does the record show the gap between her averages and the next person? Yes. She was 27% to 44% lower than the other sample processors. And the next person up. Yes. So she wasn't just below that process. And she herself testified on a number of occasions that, because there was a question about her training and how that impacted, although I think it's impossible to say how a particular bit of training may have impacted it. She said on numerous occasions, I got all the training I needed and asked for. I got the training to be able to do my job. I grasped it. And apparently she didn't understand, because, I mean, if you see our briefs, on more than a dozen occasions she made statements, and they are presented as evidence that says, I was making my quota in the two weeks before my termination. I had started to make my quota. I was making it every day. Simply not true. No, that's not true. But here's the problem. We have a case where it seems that she was subjected to racially discriminatory incidents, and at the same time she's not making her quota. So how one teases out the effect of the racial discrimination on her performance isn't the easiest thing in the world to do. It's, you know, of course companies are not required to keep people who simply can't do the job, and I'm sure that's essentially what the Polaris people said when they let her go. You're not doing the job. We have to have somebody who can process faster. But it's tainted by this racial discrimination. And those three decision makers who looked at the data, who made sure that she had been given two and more informal fair warnings, who looked at what other people were doing, who looked at the training and saw that Ms. Miller had said that she had gotten all the training she had needed, those people looked at that evidence and they made a decision based on that. Now, I mean, when you talk about this racial discriminatory sort of thing, at her performance evaluation Ms. Miller didn't say, Rhonda Ballard is mixing up my trays. Rhonda Ballard is not speaking to me. She made no comment. She said, I understand. I need to do better. At her performance evaluation she did not say any of those things. There is no evidence that she complained that she was being meddled with because of her race. There is just no evidence of that until after she filed her lawsuit. So you're saying that if she didn't ever complain about it, then if there's now evidence that she was being meddled with, it doesn't count? Well, she did not try to justify her low scores by anything other than the fact that she just couldn't do it, that she just could not do it. And the decision makers had the information that they had, which was clear and undisputable, was that she was far below. She only ever made 70%. And, in fact, in April she went down from March. And it was in November that she said she got all the training that she needed. But in all of those months she was unable to come even close. Now, I would say, and I don't know what the company would do, but let's say at the end of April she had been at an average of 255. I can't say that the decision might not have been different. But there seemed to be no way that that was going to happen. Everyone else had been able to get up to quota within about two months. Even the two people that started just about the same time as her, even Amanda Saperstein, who had exactly the same training as Chantel Miller did, working with Debbie New, who is the manager of the department. So under no method of proof is there evidence. There is lots of supposition and perception and statements that are just completely contradicted by the record that Ms. Miller makes, but there is no evidence to support any of the elements that are necessary for this case to proceed to trial. All right, thank you very much. Anything further, Mr. Darst? Thank you, Donna. Approximately how much time do I have? How much time is it? Two minutes. Two minutes. I'll try to be quick. Polaris mentioned Amanda Saperstein. On appendix pages A, 39, and 40, it shows that Amanda Saperstein was given the quota of 30 samples logged per hour, which would be 240 per day, and that was more than a year after she was hired. Chantel Miller was not given that opportunity. As a matter of fact, Polaris keeps saying that it gave Chantel Miller three opportunities. It did not. As a matter of fact, it set her up to fail. It gave her a performance, excuse me, a probation notice, second probation notice, that was almost impossible for anyone to complete, according to Polaris, and didn't even tell her about it until after seven days had passed. She had already told in March the HR manager, Ziegler, that Rhonda Ballard was still doing these things to her, and instead of taking any corrective action, they put her on an impossible performance improvement plan. That refers back to the evaluation on supplemental appendix one, in which the company, Rhonda Ballard in particular, said she, Miller, has been given several challenging customers, admitted that, and has adequately logged those samples. And then down below, Miller, and I won't quote it, but talked about how she's been given all kinds of paperwork trays for customers who are identified as difficult customers. And those customers, by the way, that people agreed, excuse me, I misread my light. You have a minute or something. Those customers were hard customers, and both she and Young identified those customers as hard customers. The hard customers that she received, she had to spend 43% of her time on, so she couldn't get up to the level of the samples done by other sample processors, because she was kept tied up more than 40% of her time on the hard customers. The other sample processors only spent about 12%, 12% to 13% of their time on the hard customers. Then the... All right. I think you need to wrap up. Thank you very much, Mr. Darst. We do have your brief as well, if you're not. And thanks as well to Ms. Mickelson. We will take the case under advisement.